**CARELLA, BYRNE, CECCHI,**
  **BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Naumon A. Amjed
Ryan T. Degnan
Barbara A. Schwartz
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Attorneys for Plaintiff Dennis Dean Laffoon*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENNIS DEAN LAFFOON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> COINBASE GLOBAL, INC., BRIAN ARMSTRONG, ALESIA J. HAAS, and EMILIE CHOI, <br><br> Defendants. | Case No. _____ |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Dennis Dean Laffoon ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Coinbase Global, Inc. ("Coinbase" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information.  Plaintiff believes that substantial

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of a class of all persons and entities who purchased or otherwise acquired Coinbase securities between April 14, 2021, and September 21, 2022, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Coinbase, a Delaware corporation, is one of the world's largest crypto asset exchanges.  Coinbase's common stock trades in the United States on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "COIN."

3.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) crypto assets Coinbase held as a custodian on behalf of its customers could qualify as property of a bankruptcy estate—and not the Company's customers—in the event Coinbase filed for bankruptcy; (2) Coinbase allowed Americans to trade crypto assets that the Company knew or recklessly disregarded should have been registered as securities with the SEC; (3) Coinbase had plans to, and did in fact, engage in proprietary trading of crypto assets; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis and misled investors regarding material risks attendant to Coinbase's operations.

4.     Plaintiff and other members of the class began to learn the truth about these undisclosed material risks on May 10, 2022, when the Company filed its first quarter 2022 financial report on Form 10-Q with the SEC (the "Q1 2022 Report").  In the Q1 2022 Report, Defendants disclosed for the first time that, "because custodially held crypto assets may be

considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets [the Company] hold[s] in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors."

5.      Later that day, Defendant Brian Armstrong—the Company's co-founder, Chief Executive Officer, and Chairman—admitted on Twitter that Coinbase had failed to appropriately communicate this risk to investors, stating that the Company "should have updated [its] retail terms sooner" and acknowledging that the Company "didn't communicate proactively."

6.      On this news, the price of Coinbase common stock declined $19.27 per share, or more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on May 11, 2022.

7.      Investors continued to learn the truth on July 25, 2022, when *Bloomberg* published an article revealing that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities" and explaining that "[i]f those products were deemed securities, the firm could need to register as an exchange with the SEC."

8.      On this news, the price of Coinbase common stock declined $14.14 per share, or approximately 21%, from a close of $67.07 per share on July 25, 2022, to close at $52.93 per share on July 26, 2022.

9.      Then, on September 22, 2022, *The Wall Street Journal* reported that Coinbase had created a business group—Coinbase Risk Solutions—in July 2021 "to generate profit, in part, by using the [C]ompany's cash to trade and 'stake,' or lock up, cryptocurrencies," a practice that sources at the Company characterized as "'proprietary' trading." According to *The Wall Street Journal*, the group completed a $100 million investment in 2022 to "profit in cryptocurrency

markets," and the transaction generated an "eagerness to make additional such transactions" within the Company.

10.     On this news, the price of Coinbase common stock declined $4.70 per share, or nearly 7%, from a close of $67.64 per share on September 21, 2022, to close at $62.94 per share on September 22, 2022.

11.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiff and other members of the class have suffered significant damages.

## II.     **JURISDICTION AND VENUE**

12.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Coinbase conducts business in this District and many of the materially false and/or misleading statements complained of herein were disseminated to investors across the United States, including investors in this District.

15.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

III.   **PARTIES**

16.   Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Coinbase securities at artificially inflated prices during the Class Period and has been damaged thereby.

17.   Defendant Coinbase is a Delaware corporation.   According to its SEC filings, Coinbase does not maintain a corporate headquarters.

18.   Defendant Brian Armstrong ("Armstrong"), the Company's co-founder, is, and was throughout the Class Period, the Company's Chief Executive Officer and Chairman of the Company's Board of Directors.

19.   Defendant Alesia J. Haas ("Haas") is, and was throughout the Class Period, the Company's Chief Financial Officer.

20.   Defendant Emilie Choi ("Choi") is, and was throughout the Class Period, the Company's President and Chief Operating Officer.

21.   Defendants Armstrong, Haas, and Choi are collectively referred to herein as the "Individual Defendants."

22.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Coinbase's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed

from, the public, and that the positive representations that were being made were then materially false and/or misleading.

23.     Coinbase and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

24.     Coinbase operates one of the world's largest crypto asset exchanges.

25.     Among other things, Coinbase provides retail investors with crypto wallets that allow those investors to securely buy, sell, and receive crypto assets.  Similarly, the Company offers institutional investors access to the Coinbase Prime platform, which allows investors to access and transact in crypto markets while also providing advanced trading, custody, analytics, and financing solutions.  In connection with these services, Coinbase also acts as a crypto asset custodian for individuals and institutions.

26.     On February 25, 2021, Coinbase filed a registration on Form S-1 with the SEC in connection with its initial listing of common stock on the NASDAQ (the "Direct Listing").  After amendments, this registration statement was declared effective by the SEC on April 1, 2021 (the "Registration Statement").

27.     On April 14, 2021, Coinbase filed a prospectus on Form 424B4 with the SEC in connection with the Direct Listing, incorporating and forming part of the Registration Statement (collectively, the "Listing Documents").

### A.     Defendants' False and Misleading Statements

28.     The Class Period begins on April 14, 2021, to coincide with the Direct Listing.

29.     The Listing Documents included a letter from Defendant Armstrong in which Armstrong touted the Company's commitment to maintaining customer trust, stating:

### A Safe, Trusted, and Easy-to-Use Platform

Coinbase is building the infrastructure to power the cryptoeconomy, helping bring the benefits of this new technology to the world. Today, you could think of our products as a safe and easy-to-use platform to buy, sell, store, save, spend, and use cryptocurrency. But for many of our customers, they simply think of us as their primary financial account in the cryptoeconomy. Coinbase is building a portfolio of different products and services that connect to this primary financial account, and we're enabling third party products and services to be connected as well. We seek to make all of our products and services the most trusted and easiest to use in the industry.

Trust is critical when it comes to storing money. . . . Most importantly, we built a culture that doesn't take shortcuts or try to make a quick buck.

30.     In this same letter, Defendant Armstrong also emphasized the Company's commitment to compliance, stating that "[f]rom the early days, [the Company] decided to focus on compliance, reaching out to regulators proactively to be an educational resource, and pursuing licenses even before they were needed."

31.     Elsewhere in the Listing Documents, Defendants reiterated the Company's focus on maintaining customer trust and regulatory compliance, stating:

We invest heavily in regulatory compliance by working with regulators around the world to shape policy, and have pioneered industry-leading security practices for safeguarding crypto assets. Our early focus on trust and usability has allowed us to become the primary on-ramp to the cryptoeconomy from the fiat-based financial system.

32.     Highlighting customers' ability to rely on Coinbase as a crypto asset custodian, Defendants emphasized Coinbase's ability to "support over 90 crypto assets for trading or custody" and touted that, "[a]s of December 31, 2020, [Coinbase] stored and custodied over $90 billion in total fiat and crypto assets on behalf of [its] customers."

33.     Additionally, Defendants described certain risk factors relating to the safeguarding of customers' assets, giving no indication that assets held in custody may be treated as the Company's property—rather than customers'—in the event the Company entered bankruptcy, stating:

> As of December 31, 2020, we held $90 billion in custodial fiat currencies and cryptocurrencies on behalf of customers. Supported crypto assets are not insured or guaranteed by any government or government agency. We have also entered into partnerships with third parties, such as with the Centre Consortium, as the chief reseller of USD Coin, where we or our partners receive and hold funds for the benefit of our customers. Our and our partners' abilities to manage and accurately safeguard these customer assets requires a high level of internal controls. As our business continues to grow and we expand our product and service offerings, we must continue to strengthen our associated internal controls and ensure that our partners do the same. Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds. In addition, we are dependent on our partners' operations, liquidity, and financial condition for the proper maintenance, use, and safekeeping of these customer assets. Any failure by us or our partners to maintain the necessary controls or to manage customer crypto assets and funds appropriately and in compliance with applicable regulatory requirements could result in reputational harm, significant financial losses, lead customers to discontinue or reduce their use of our and our partners' products, and result in significant penalties and fines and additional restrictions, which could adversely impact our business, operating results, and financial condition.
>
> We deposit, transfer, and custody customer cash and crypto assets in multiple jurisdictions. In each instance, we are required to safeguard customers' assets using bank-level security standards applicable to our hot and cold wallet and storage systems, as well as our financial management systems related to such custodial functions.

34.     With respect to regulatory compliance, Defendants assured investors that the Company closely monitored regulatory developments and took compliance seriously, explaining:

> The laws and regulations to which we are subject, including those pertaining to digital assets and crypto assets, are rapidly evolving and increasing in scope.  Therefore, we monitor these areas closely and invest significant resources in our legal, compliance, product, and engineering teams to ensure our business practices evolve to help us comply with the current laws, regulations, and legal standards to which we are subject, as well as to plan and prepare for changes in interpretations thereof, as well as additional laws, regulations and legal standards that are introduced in the future.

35.     The Listing Documents also described the limited circumstances in which Coinbase sold its own crypto assets, with Defendants explaining that revenue from such sales was limited to "[p]eriodic[]" instances in which, "as an accommodation to customers, [Coinbase] may fulfill customer transactions using [the Company's] own crypto assets."

36.     Defendants continued to tout Coinbase's strength as a crypto custodian throughout the Class Period.  For example, on May 13, 2021, Coinbase published a shareholder letter discussing the Company's financial results for the first quarter of 2021 (the "Q1 2021 Shareholder Letter").  In the Q1 2021 Shareholder letter, Defendants explained that "[t]rading in other crypto assets comprised 40% of first quarter trading volume, reflecting broadening consumer and institutional adoption of a greater number of crypto assets" and noted that, "[a]s of March 31, 2021, [Coinbase] supported 108 unique crypto assets on our platform for trading and custody, up from 90 at the end of 2020."

37.     On August 10, 2021, Coinbase published a shareholder letter discussing the Company's financial results for the second quarter of 2021 (the "Q2 2021 Shareholder Letter").  In the Q2 2021 Shareholder Letter, Defendants again touted the strength of the Company's custody offerings, stating:

> Throughout Q2, we continued to enhance the depth and breadth of the assets we support.  We want to treat asset issuers as the important customers they are and empower our users to make their own risk-adjusted decisions.  Overall, we executed well against this goal as

9

we added 29 new assets for trading and 39 new assets for custody during the first six months of 2021.  In Q2 alone, we added more assets for trading than we added in all of 2020.  We currently support 83 assets for trading and 142 for custody.  The addition of more assets is helping to drive diversification in the assets our customers are transacting in.

*       *       *

**Custody**

Custodial fee revenues grew to $31.7 million in Q2, up 35% compared to Q1.  Our track record of keeping assets safe while operating at scale has been enabled by a multi-year investment in segregated cold storage that is built on a principled approach to security.  Our product was also designed to meet regulatory and compliance requirements – a key decision criteria for many of our clients – while still offering an intuitive experience that supports institutional workflows.

38.     During the Company's quarterly earnings call with investors held that same day, Defendant Armstrong emphasized the trust Coinbase's customers had in the Company's custodial offerings, explaining that "people not only trust us to do custody and store crypto assets, but we also have our prime brokerage product integrated, so they have the full suite of products . . . . we basically have this one-stop shop where you can store your crypto, trade it, earn yield, do post-trade credits and things like that, that are needed all in one place."

39.     The next day, on August 11, 2021, the Company filed its second quarter 2021 financial results with the SEC on Form 10-Q ("Q2 2021 Report").  In the Q2 2021 Report, Defendants reiterated that Coinbase's "products are built to be safe, trusted, and easy to use for both retail and institutional users."  Defendants again represented that the Company generates a small amount of revenue from "the sale of crypto assets when we are the principal in the transaction" only when, "[p]eriodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. . . . for orders that do not meet the minimum

10

trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions."

40.     On November 9, 2021, Coinbase published a shareholder letter discussing the Company's financial results for the third quarter of 2021 (the "Q3 2021 Shareholder Letter").  In the Q3 2021 Shareholder Letter, Defendants once again touted the Company's broad custodial offerings, stating:

> Our strategy to list all legal assets helps give our customers more choice and deepen their engagement with the cryptoeconomy.  In Q3, we accelerated our pace of asset additions, adding 30 new assets for trading plus an additional 19 assets for custody.  At the end of Q3, we supported 103 assets for trading and 158 assets for custody on our platform.   Trading volume from Other Crypto Assets comprised 59% of our total volume in Q3, up from 50% in Q2.  This compares to Other Crypto Assets comprising approximately 42% of the total crypto market capitalization as of September 30, 2021.  We continue to invest in our asset review process, including automation and related tooling to drive faster asset addition.

41.     During the Company's quarterly conference call with investors held that same day, Defendant Haas responded to a question from a MoffettNathanson analyst about the impact of crypto exchange traded funds ("ETFs") on Coinbase's business by highlighting the fact that Coinbase's custody capability could support the ETF market.  Specifically, Haas explained that "[o]bviously, the Bitcoin ETFs will also benefit the broader spot market, and we have the ability to provide custody solutions and are actively having conversations of how we can support the broader ETF adoption."

42.     During a Goldman Sachs financial services conference on December 7, 2021, a Goldman Sachs analyst characterized the notion that the Company did not "take proprietary risk on the institutional side" as "one of the hallmarks of [the Company's] business" relative to its competitors and asked Defendant Choi to opine on how refusing to engage in proprietary trading

was important for the Company's business.   In response, Defendant Choi emphasized the Company's firm policy against proprietary trading, explaining:

> I mean I think it's kind of obvious in a way.  It's just people don't want to feel like you're trading -- institutions don't want to feel like you're going to be trading against them.  And so we've always had a clear line about not doing that.

43.     The next day, on December 8, 2021, Defendant Haas echoed Defendant Choi's statements when she testified before the United States House of Representatives Committee on Financial Services (the "Committee").   Defendant Haas explained that "Coinbase is an agency-only platform" that "do[es] not engage in proprietary trading."   When Representative Alexandria Ocasio-Cortez specifically asked Defendant Haas whether Coinbase traded its own corporate funds on the crypto asset exchanges it operates, Defendant Haas assured the Committee that Coinbase does not actively trade crypto assets for profit and, instead, only buys crypto assets for long-term investment purposes, stating:

> There are a few things that we do in our business.  One is, we do have a corporate investment portfolio that every month we make an investment in crypto and add to our balance sheet.  We have not sold that.  We don't trade it actively, but we do increase the investment on a monthly basis on pre-established investment protocols.  We do buy those on our exchange.

44.     On February 24, 2022, Coinbase published a shareholder letter discussing the Company's financial results for the fourth quarter and full year 2021 (the "Q4 2021 Shareholder Letter").   In the Q4 2021 Shareholder Letter, Defendants once again touted the size and strength of the Company's custody offerings, stating:

> As part of our strategy to serve as the primary crypto account and give our customers the greatest amount of choice, we want to list all legal assets.  Over the course of 2021, we accelerated our asset listing efforts.  In Q4, we added custody and trading support for 14 and 36 assets, respectively.  We ended 2021 with support for 172 assets for custody and 139 assets for trading.

\*     \*     \*

> Custodial fee revenue was $49.6 million in Q4, up 58% from Q3. The primary factor driving the sequential increase was higher average crypto asset prices in Q4 compared to Q3.  In addition, we continued to see billions of dollars of net inflows from new customers.  On a full-year basis, we generated $136.3 million of Custodial fee revenue in 2021, up from $18.6 million in 2020.  We added custody support for 72 assets throughout 2021 and more than doubled our custody customers in 2021 as more and more institutions choose Coinbase for our best-in-class storage solutions.

\*     \*     \*

> The first pillar of our strategy is crypto as an investment.  To expand our core investing business, we are focused on increasing access to crypto by integrating with more fiat payment rails and payments partnerships as well as supporting more assets for trading and custody.

45.     In the Q4 2021 Shareholder Letter, Defendants also repeated their assurances to investors that the Company was committed to compliance, stating:

> Looking ahead, we will continue to invest in our asset review process, including expanding our team, improving automation and tooling, and emphasizing our rigorous process where we evaluate security, legality, and compliance.

46.     On February 25, 2022, Coinbase filed its 2021 annual report on Form 10-K with the SEC (the "2021 Annual Report").  In the 2021 Annual Report, Defendants reassured investors of the Company's "emphasis on accessibility, trust, and ease of use" and asserted that Coinbase had "a trusted platform owing to [its] heritage of security and culture of regulatory compliance," touting the Company's "significant investments in regulatory compliance . . . to earn the trust of [its] customers."  Defendants also emphasized that the Company's "institutional-grade custody" service was "a highly secure cold storage solution made available through [its] U.S. qualified custodian, which offers audits, governance, digital key management, and physical security."

47.     As in the Listing Documents, Defendants described certain risk factors regarding safeguarding customers' assets in the 2021 Annual Report, but did not indicate that assets held in custody may be treated as the Company's property in the event the Company entered bankruptcy, stating only that:

> Supported crypto assets are not insured or guaranteed by any government or government agency. . . . Our and our partners' abilities to manage and accurately safeguard these customer assets requires a high level of internal controls. As our business continues to grow and we expand our product and service offerings, we must continue to strengthen our associated internal controls and ensure that our partners do the same.  Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds.  In addition, we are dependent on our partners' operations, liquidity, and financial condition for the proper maintenance, use, and safekeeping of these customer assets.  Any failure by us or our partners to maintain the necessary controls or to manage customer crypto assets and funds appropriately and in compliance with applicable regulatory requirements could result in reputational harm, significant financial losses, lead customers to discontinue or reduce their use of our and our partners' products, and result in significant penalties and fines and additional restrictions, which could adversely impact our business, operating results, and financial condition.
>
> We deposit, transfer, and custody customer cash and crypto assets in multiple jurisdictions. In each instance, we are required to safeguard customers' assets using bank-level security standards applicable to our wallet and storage systems, as well as our financial management systems related to such custodial functions.

48.     Defendants also touted the Company's controls and policies to prevent the unregistered sale of securities on its platform in the 2021 Annual Report, stating:

> We have policies and procedures to analyze whether each crypto asset that we seek to facilitate trading on our platform could be deemed to be a "security" under applicable laws.  Our policies and procedures do not constitute a legal standard, but rather represent our company-developed model, which permits us to make a risk-based assessment regarding the likelihood that a particular crypto

asset could be deemed a "security" under applicable laws. . . . we only permit trading on our core platform of those crypto assets for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security.  We believe that our process reflects a comprehensive and thoughtful analysis and is reasonably designed to facilitate consistent application of available legal guidance to crypto assets to facilitate informed risk-based business judgment. . . .  We expect our risk assessment policies and procedures to continuously evolve to take into account case law, facts, and developments in technology.

49.     Defendants further noted that "laws and regulations to which [the Company is] subject" are "rapidly evolving and increasing in scope" and assured investors:

> [The Company] monitor[s] these areas closely and invest[s] significant resources in [its] legal, compliance, product, and engineering teams to ensure our business practices evolve to help [it] comply with the current laws, regulations, and legal standards . . . as well as to plan and prepare for changes in interpretations thereof, as well as additional laws, regulations and legal standards that are introduced in the future.

50.     Additionally, Defendants reiterated that revenue from the Company's sale of its own crypto assets was restricted to limited circumstances in which, "[p]eriodically, as an accommodation to customers, [Coinbase] may fulfill customer transactions using [the Company's] own crypto assets."

51.     As required by the Sarbanes-Oxley Act of 2002, Defendants Armstrong and Haas certified that they had reviewed the 2021 Annual Report, that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

52.     In the Company's quarterly financial reports filed with the SEC on Forms 10-Q on May 10, 2022, and August 9, 2022, Defendants again reiterated that revenue from the Company's

sale of its own crypto assets was limited and occurred when "[p]eriodically, as an accommodation to customers, [Coinbase] may fulfill customer transactions using the Company's own crypto assets."

53.     The statements in ¶¶ 29 - 52 are materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) crypto assets Coinbase held as a custodian on behalf of its customers could qualify as property of a bankruptcy estate—and not the Company's customers—in the event Coinbase filed for bankruptcy; (2) Coinbase allowed Americans to trade crypto assets that the Company knew or recklessly disregarded should have been registered as securities with the SEC; (3) Coinbase had plans to, and did in fact, engage in proprietary trading of crypto assets; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis and misled investors regarding material risks attendant to Coinbase's operations.

**B.     The Truth Emerges**

54.     Plaintiff and other members of the Class began to learn the truth on May 10, 2022, when the Company filed its first quarter 2022 financial report on Form 10-Q with the SEC.  In the Q1 2022 Report, Defendants disclosed for the first time that crypto assets the Company holds in custody on behalf of customers could be treated as the Company's assets in the event of bankruptcy.  Specifically, Defendants explained:

> ***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition.***
>
> As of March 31, 2022, we held $256 billion in custodial fiat currencies and cryptocurrencies on behalf of customers.  Supported crypto assets are not insured or guaranteed by any government or government agency. . . .  Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer

16

funds.  In addition, we are dependent on our partners' operations, liquidity, and financial condition for the proper maintenance, use, and safekeeping of these customer assets.  Any failure by us or our partners to maintain the necessary controls or to manage customer crypto assets and funds appropriately and in compliance with applicable regulatory requirements could result in reputational harm, litigation, regulatory enforcement actions, significant financial losses, lead customers to discontinue or reduce their use of our and our partners' products, and result in significant penalties and fines and additional restrictions, which could adversely impact our business, operating results, and financial condition.   Moreover, ***because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors.  This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition***.

55.     Later that day, Defendant Armstrong admitted on Twitter that the Company had failed to appropriately communicate this risk to investors, stating:

> We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added.  My deepest apologies, and a good learning moment for us as we make future changes.

56.     On this news, the price of Coinbase common stock declined $19.27 per share, or more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on May 11, 2022.

57.     Two days later, on May 12, 2022, Adam J. Levitin, a professor at Georgetown University Law Center published a draft of an article entitled "Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency," set to appear in the *Texas Law Review*.  In the article, Professor Levitin argues that, in the event a crypto asset exchange files for bankruptcy, bankruptcy courts are likely to deem custodial holdings of crypto assets to be property of the bankrupt

exchange, rather than the property of its customers.  The abstract of the August 28, 2022 draft of

the article stated, in pertinent part:

> Cryptocurrency exchanges play a key role in the cryptocurrency
> ecosystem, serving not only as central marketplaces for buyers and
> sellers to trade, but also as custodians for their customers'
> cryptocurrency holdings.  Exchanges, however, are thinly regulated
> for safety-and-soundness and face major insolvency risks from their
> own proprietary investments and hacking.  This Article considers
> what would happen to customers' custodial holdings if a
> cryptocurrency exchange in the United States were to fail.

> Any custodial relationships can potentially be characterized as a
> debtor-creditor relationship between the custodian and customer,
> rather than an entrustment or bailment of property.  U.S. law gives
> substantial protection to the custodial holdings of securities,
> commodities, or cash deposits by securities or commodities brokers
> or banks.  No such regime exist, however, for custodial holdings of
> cryptocurrencies.  Instead, bankruptcy courts might well deem the
> custodial holdings to be property of the bankrupt exchange, rather
> than of its customers.  If so, the customers would merely be general
> unsecured creditors of the exchange, entitled only to a pro rata
> distribution of the exchange's residual assets after any secured or
> priority creditors had been repaid.  And, even if the holdings were
> ultimately deemed property of the customers, however, the
> customers would still experience extended disruption to their access
> to their holdings.

58. Investors continued to learn the truth about the Company's operations on July 25,

2022, after the markets closed, when *Bloomberg* published an article revealing that the SEC was

investigating whether Coinbase "let Americans trade digital assets that should have been registered

as securities."

59. *Bloomberg* further detailed the SEC's heightened scrutiny of Coinbase, explaining:

> The US Securities and Exchange Commission's scrutiny of
> Coinbase has increased since the platform expanded the number of
> tokens in which it offers trading, said two of the people, who asked
> not to be named because the inquiry hasn't been disclosed publicly.
> The probe by the SEC's enforcement unit predates the agency's
> investigation into an alleged insider trading scheme that led the
> regulator last week to sue a former Coinbase manager and two other
> people.

*     *     *

> As the largest US trading platform, Coinbase lets Americans trade
> more than 150 tokens.  If those products were deemed securities, the
> firm could need to register as an exchange with the SEC. . . .
>
> Coinbase has repeatedly sparred with the agency over how it
> oversees the industry, and the firm last week called on the SEC to
> propose clearer rules.  Meanwhile, after taking a relatively cautious
> approach for years, Coinbase has boosted its token offerings.
>
> Tensions bubbled up further July 21 when the SEC accused one of
> the company's former employees of violating its insider-trading
> rules by leaking information to help his brother and a friend buy
> tokens just before they were listed on the platform.  While the
> agency didn't allege wrongdoing by Coinbase, the SEC said it had
> determined that nine of the dozens of digital tokens the men traded
> were securities -- including seven the exchange says it lists.
>
> Federal prosecutors in Manhattan also charged the three men with
> wire fraud conspiracy and wire fraud.

60.     On this news, the price of Coinbase common stock declined $14.14 per share, or

approximately 21%, from a close of $67.07 per share on July 25, 2022, to close at $52.93 per share

on July 26, 2022.

61.     Then, on September 22, 2022, *The Wall Street Journal* reported that Coinbase had

created a unit, Coinbase Risk Solutions, in July 2021 "to generate profit, in part, by using the

[C]ompany's cash to trade and 'stake,' or lock up, cryptocurrencies," a practice that sources at the

Company characterized as "'proprietary' trading."

62.     Among other things, *The Wall Street Journal* detailed a 2022 transaction wherein

Coinbase invested $100 million raised from the sale of a structured note in order to "profit in

cryptocurrency markets" and explained that "[t]he trade occurred after the crypto market started

to fall from its all-time high, eating into Coinbase's business."  Reportedly, the investment "was

profitable for Coinbase"—prompting Brett Tejpaul, Coinbase's Head of Institutional Sales,

Trading, Custody, and Prime Services, to "praise[] the executives who worked on the transaction in internal communications and expressed eagerness to make additional such transactions."

63.     *The Wall Street Journal* also revealed that those in the highest levels of the Company—including Defendant Haas—had been involved in Coinbase Risk Solutions's creation, and that "[e]mployees were discouraged from sharing information about the new trading business or discussing it in internal communications."

64.     On this news, the price of Coinbase common stock declined $4.70 per share, or 6.9%, from a close of $67.64 per share on September 21, 2022, to close at $62.94 per share on September 22, 2022.

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Coinbase securities during the Class Period (the "Class").  Excluded from the Class are Defendants, their agents, directors and officers of Coinbase, and their families and affiliates.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

67.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        a.      Whether Defendants violated the Exchange Act;

        b.      Whether Defendants omitted and/or misrepresented material facts;

     c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

     d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

     e.     Whether the price of Coinbase securities were artificially inflated; and

     f.     The extent of damage sustained by members of the Class and the appropriate measure of damages.

68. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

69. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

70. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

71. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

     a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

     b.     The omissions and misrepresentations were material;

     c.     The Company's securities traded in an efficient market;

d.      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.      Plaintiff and the Class purchased Coinbase securities between the time Coinbase and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

72.    At all relevant times, the market for Coinbase securities was efficient because: (1) as a regulated issuer, Coinbase filed periodic public reports with the SEC; and (2) Coinbase regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**VII.    <u>NO SAFE HARBOR</u>**

73.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Coinbase who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by

Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

74.   Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Coinbase securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Coinbase securities during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.   SCIENTER ALLEGATIONS

75.   During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Coinbase securities during the Class Period.

## X.   CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

76.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

77.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Coinbase

securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

78.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

80.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

81.     The Individual Defendants acted as controlling persons of Coinbase within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

83.     As described above, Coinbase and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Coinbase securities during the Class Period.

## XI.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## XII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2022                          Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P.C.**

*s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Naumon A. Amjed
Ryan T. Degnan
Barbara A. Schwartz
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com
bschwartz@ktmc.com

***Attorneys for Plaintiff Dennis Dean Laffoon***